# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HORIZON SHIPBUILDING, Inc., | |
| Debtor. | Case No. 17-04041 (JCO) |

**FINAL ORDER APPROVING SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND GRANTING RELATED RELIEF**

Upon the *Motion of the Debtor for Entry of an Order Authorizing the Sale of Certain of the Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances and Other Interests and Granting Related* Relief, [Docket No. 206] (the "Motion");[1] and the Court having entered an Order Conditionally Approving the Motion (the "Conditional Approval Order") [Docket No. 250] following an evidentiary hearing on May 22, 2018, and an Order Approving Bidding Procedures (the "Bidding Procedures Order") [Docket No. 254]; and the Debtor having solicited bids in accordance with the Bidding Procedures Order; and no bids having been received by the Bid Deadline (as defined in the Bidding Procedures Order); and the Debtor having filed its Report by Debtor's Counsel of Receipt of No Qualified Bid [Docket No. 266]; and upon the record of the hearing conducted on June 5, 2018 (the "Sale Hearing") and upon the record of the docket in the Debtor's Chapter 11 Case; and after due deliberation and good and sufficient cause appearing therefor;

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**[2]

A.      On October 24, 2017 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

B.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of the Chapter 11 Case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory and rule based predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008.

D.      As evidenced by the certification of service previously filed with the Court, and based on the representations of counsel at the hearing on May 22, 2018 and the Sale Hearing: (i) proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014; (ii) such notice was good and sufficient, and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing or the entry of this Order shall be required.  The Debtor has complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing and the Sale required by the Conditional Approval Order and the Bidding Procedures Order

---

[2]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.     A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

F.     As demonstrated by the record of the hearing held on May 22, 2018 and the Sale Hearing, and the docket in the Chapter 11 Case, the Debtor has demonstrated good and sufficient reasons for the Court to approve the sale (the "Sale") of the Purchased Assets (as defined below) to Purchaser.

G.     The "Purchased Assets" shall include all assets set forth in Section 2.1 in the Asset Purchase Agreement by and between the Debtor and Purchaser, substantially in the form attached hereto as Exhibit A (together with the exhibits and schedules thereto, collectively (each as may be amended or supplemented from time to time), the "Asset Purchase Agreement").

H.     The Debtor is the sole and lawful owner of the Purchased Assets.

I.     The Debtor complied in all respects with the Bidding Procedures Order.  The sale process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.

J.     The offer of Purchaser to purchase the Purchased Assets is the highest or otherwise best offer received for the Sale of the Purchased Assets, and no other Qualified Bidder has submitted a Qualified Bid for the Purchased Assets that provides greater economic value to the Debtor's estate than Purchaser.

K.     The purchase price to be paid by Purchaser as set forth in the Asset Purchase Agreement is fair and constitutes reasonably equivalent value and reasonable market value for the Purchased Assets.

L.     Purchaser is a purchaser in good faith with respect to the Purchased Assets, as that term is used in section 363(m) of the Bankruptcy Code.  The Asset Purchase Agreement was

99999.40176 578103v2

negotiated, proposed and entered into by the parties in good faith, from arm's length bargaining positions and without collusion, and Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Purchased Assets. Neither the Debtor nor Purchaser has engaged in conduct that would cause or permit the Asset Purchase Agreement to be voided under section 363(n) of the Bankruptcy Code.

M.    Except as specifically provided in the Asset Purchase Agreement, Purchaser shall not assume or become liable for any Encumbrances (defined below) relating to the Purchased Assets being sold by the Debtor unless expressly stated in the Asset Purchase Agreement or this Order. Any such valid and enforceable Encumbrances shall attach to the proceeds of the Sale. Until the Closing occurs Purchaser shall be responsible for paying principal and interest due to PNC Bank, Regions Bank and Regions Equipment Finance and Regions Commercial Equipment Finance.

N.    Sound business reasons have been articulated for performing the obligations under the Asset Purchase Agreement and selling the Purchased Assets as set forth in the Motion outside of a plan of reorganization, and it is a reasonable exercise of business judgment to execute, deliver and consummate the Asset Purchase Agreement with Purchaser and consummate the transactions contemplated by the Asset Purchase Agreement.

O.    The Debtor may sell the Purchased Assets free and clear of any Encumbrances pursuant to the terms of this Order because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of such Encumbrances who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

99999.40176 578103v2

P.      The terms and conditions of the Asset Purchase Agreement, including the total consideration to be realized by the Debtor pursuant to the Asset Purchase Agreement, are fair and reasonable and the transaction contemplated by the Asset Purchase Agreement is in the best interests of the Debtor, its creditors and its estate.

Q.      A valid business purpose exists for approval of the transaction contemplated by the Motion pursuant to sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code. The Debtor may sell, transfer and assign the Purchased Assets free and clear of the Encumbrances in accordance with sections 105(a) and 363 of the Bankruptcy Code, with Encumbrances to attach to the proceeds of the Sale. As a condition to purchasing the Purchased Assets, Purchaser requires that: (a) the Purchased Assets be sold free and clear of the Encumbrances; and (b) Purchaser shall have no liability whatsoever for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtor except those expressly assumed in the Asset Purchase Agreement or by this Order. Purchaser would not enter into the Asset Purchase Agreement and consummate the transactions contemplated by the Asset Purchase Agreement, thus adversely affecting the Debtor's estate, if the Sale to Purchaser was not free and clear of Encumbrances or if Purchaser was or would be liable for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtor, except as otherwise explicitly provided in the Asset Purchase Agreement or this Order.

R.      The transfer of the Purchased Assets to Purchaser is or will be a legal, valid and effective transfer of the Purchased Assets, and will vest Purchaser with all right, title and interest in and to the Purchased Assets, free and clear of Encumbrances, except those explicitly and expressly excluded by Purchaser in the Asset Purchase Agreement or this Order.

99999.40176 578103v2

S. An injunction against creditors and third parties pursuing Encumbrances is necessary to induce Purchaser to close under the Asset Purchase Agreement; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtor's estate, and will benefit all creditors.

T. The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the Sale of the Purchased Assets have been satisfied.

U. The entry of this Order is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and it is therefor

**ORDERED, ADJUDGED AND DECREED THAT**:

1. The Motion shall be, and hereby is, granted on a final basis, with respect to the Sale of the Purchased Assets.

2. All objections to the Motion that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled on the merits and denied.

3. The Asset Purchase Agreement and the transactions contemplated thereby are approved, and the Debtor is authorized, empowered and directed to perform its obligations under the Asset Purchase Agreement and to take such action as is necessary to effectuate the terms of the Asset Purchase Agreement, without any further corporate authorization or order of the Court.

4. The Debtor is hereby authorized, empowered and directed, pursuant to sections 105(a) and 363(b) and (f) of the Bankruptcy Code, to sell the Purchased Assets to Purchaser pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, and, pursuant to section 363(f) of the Bankruptcy Code, title to the Purchased Assets shall pass to Purchaser on the date of the closing of the transactions contemplated by the Asset Purchase Agreement (the "Closing Date"), free and clear of any and all liens (including mechanics',

99999.40176 578103v2

materialmens' and other consensual and non-consensual liens and statutory liens), security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in section 101(5) of the Bankruptcy Code), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan Asset Purchase Agreements, instruments, contracts, leases, licenses, options, rights of first refusal, rights of offset, recoupment, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims, to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by Asset Purchase Agreement, understanding, law, equity or otherwise (collectively, the "Encumbrances"), other than the Permitted Encumbrances identified in the Asset Purchase Agreement and any lien asserted by a taxing authority for an unpaid real or personal property tax. Purchaser shall pay any unpaid real or personal property tax on or before the Closing. Pursuant to this Order, all such Encumbrances upon the Purchased Assets hereby are unconditionally released, discharged and terminated, with all such Encumbrances to attach only to the proceeds of the Sale with the same priority, validity, force and effect as they existed with respect to the Purchased Assets prior to the Closing Date except as may be set forth herein.

99999.40176 578103v2

5.     The Debtor and Purchaser are directed to comply, and shall comply, with all provisions of the Asset Purchase Agreement.

6.     Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or any other related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

7.     The transfer of the Purchased Assets to Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid and effective transfer and shall vest Purchaser with all right, title and interest of the Debtor in and to the Purchased Assets so transferred.

8.     This Order shall be binding in all respects upon the Debtor, its estate, all creditors, all holders of equity interests in the Debtor, all holders of any interests or claims (whether known or unknown) against the Debtor, any holders of interests or claims against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtor, Purchaser and all successors and assigns of Purchaser and any trustees, examiners or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in the Chapter 11 Case or upon a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. This Order and the Asset Purchase Agreement shall be binding upon, and shall inure to the benefit of the Debtor, and Purchaser, and their respective successors and assigns, including without limitation, any chapter 11 trustee hereinafter appointed for the Debtor or any trustee appointed in a chapter 7 case, and its estate and creditors, if the Chapter 11 Case is converted from chapter 11.

9.     On the Closing Date, each of the creditors of the Debtor is authorized and directed to execute such documents and take all other actions as may be necessary to release the

99999.40176 578103v2

Encumbrances against or in the Purchased Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

10.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Purchased Assets shall not have delivered to the Debtor prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Purchased Assets or otherwise, the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets.

11.     Effective upon the Closing Date, all parties and/or entities asserting Encumbrances or contract rights against the Debtor and/or any of the Purchased Assets are hereby permanently enjoined and precluded from, with respect to such Encumbrances:  (i) asserting, commencing or continuing in any manner any action against Purchaser or any director, officer, agent, representative or employee of Purchaser (all such entities are collectively referred to as the "Protected Parties") or against any Protected Party's assets or properties, including without limitation the Purchased Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Purchased Assets of the Protected Parties, including without limitation the Purchased Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Purchased Assets of the Protected Parties, including without limitation the Purchased Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any

99999.40176 578103v2

place whatsoever, that does not conform to or comply with the provisions of this Order or the Asset Purchase Agreement.

12. The provisions of this Order authorizing the Sale of the Purchased Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale of the Purchased Assets, as provided in this Order) shall be self-executing, and none of the Debtor, Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such Sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the Asset Purchase Agreement. Without in any way limiting the foregoing, Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such Sale.

13. A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

14. Consummation of the Asset Purchase Agreement and the transactions contemplated therein and thereby do not effect a *de facto* merger or consolidation of the Debtor and Purchaser or result in the continuation of the Debtor's business under Purchaser's control. Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtor, nor is Purchaser otherwise liable for the Debtor's debts and obligations, unless otherwise specifically provided for in the Asset Purchase Agreement or pursuant to this Order.

99999.40176 578103v2

15.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to Purchaser on the Closing Date.

16.     Nothing contained in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Case or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

17.     As of the Closing Date, all agreements of any kind whatsoever and all orders of the Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit the consummation of the Sale.

18.     The purchase by Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Asset Purchase Agreement and Sale shall not affect the validity of the Sale to Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

19.     The Sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code. The consideration provided by Purchaser for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration.

20.     The failure to specifically include any particular provisions of the Asset Purchase Agreement including any of the documents, agreements or instruments executed in connection therewith in this Order shall not diminish or impair the efficacy of such provision, document,

99999.40176 578103v2

agreement or instrument, it being the intent of the Court that the Asset Purchase Agreement and each document, agreement or instrument be authorized and approved in its entirety.

21.     Notwithstanding Bankruptcy Rules 6004, 6006 and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the Motion shall be deemed to provide sufficient notice of the Debtor's request for relief from any stay. In the absence of any person or entity obtaining a stay pending appeal, the Debtor and Purchaser are free to close under the Asset Purchase Agreement at any time, subject to the terms of the Asset Purchase Agreement. In the absence of any person or entity obtaining a stay pending appeal, if the Debtor and Purchaser close the transactions contemplated by the Asset Purchase Agreement, Purchaser shall be deemed to be acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Asset Purchase Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

22.     The provisions of this Order are nonseverable and mutually dependent.

23.     From and after entry of this Order, neither the Debtor nor any other Person shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Assets either to the Debtor prior to the Closing Date, for subsequent transfer to Purchaser on the Closing Date, or to Purchaser in accordance with the terms and conditions of the Asset Purchase Agreement and this Order.

24.     The Debtor is hereby authorized to change its corporate name and the caption of this Chapter 11 Case, consistent with applicable law. The Debtor shall file a notice of change of case caption, containing the new caption and the proposed new corporate name of the Debtor,

99999.40176 578103v2

within five (5) business days of the Closing Date, and the change of case caption for this Chapter 11 Case shall be deemed effective as of the Closing Date.

25.     The Court shall retain exclusive jurisdiction to interpret, implement and enforce the provisions of this Order and the Asset Purchase Agreement and to hear and determine all matters arising from the implementation of this Order and any issues relating to the Asset Purchase Agreement, this Order or the rights and duties of the parties hereunder or thereunder, including, but not limited to, interpretation of the terms, conditions and provisions thereof, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Assumed Contracts and Assumed Leases free and clear of the Encumbrances.

26.     If there is any discrepancy between the Motion, the Conditional Approval Order, the Bidding Procedures Order and/or this Order, this Order shall control.


 Dated:  June 5, 2018


_____
JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE

99999.40176 578103v2

## Exhibit A

**Asset Purchase Agreement**

99999.40176 578103v2

ASSET PURCHASE AGREEMENT

Dated as of April 19, 2018

Among

HORIZON SHIPBUILDING, INC. and
SHIP AND SHORE CONSTRUCTION, LLC,

As Sellers

and

SHARK TECH LLC

and/or its assignees and designees,

As Purchaser

99999.40176 560609v4

# TABLE OF CONTENTS

EXHIBIT LIST ............................................................................................................ iv

**SECTION 1 DEFINITIONS** ...................................................................................... 1

    1.1        Definitions. ................................................................................ 1
    1.2        Other Definitional and Interpretive Matters. ............................ 9

**SECTION 2 PURCHASE AND SALE** ...................................................................... 10

    2.1        Purchased Assets. .................................................................... 10
    2.2        Excluded Assets. ..................................................................... 12
    2.3        Assumed Liabilities. ................................................................ 13
    2.4        Excluded Liabilities. ................................................................ 14
    2.5        Assignments. ........................................................................... 15
    2.6        Further Assurances. ................................................................. 15

**SECTION 3 PURCHASE PRICE** ............................................................................ 16

    3.1        Purchase Price. ........................................................................ 16
    3.2        Closing Date Payments. ........................................................... 17

**SECTION 4 CLOSING AND POST CLOSING ACCESS** ...................................... 17

    4.1        Closing; Closing Date. ............................................................. 17
    4.2        Purchaser's Deliveries. ............................................................ 17
    4.3        Sellers' Deliveries. .................................................................. 18
    4.4        Closing Proceedings. ............................................................... 19
    4.5        Risk of Loss and Possession. ................................................... 19
    4.6        Access. ..................................................................................... 19

**SECTION 5 REPRESENTATIONS AND WARRANTIES OF SELLERS** ........................ 19

    5.1        Organization of Sellers. ........................................................... 19
    5.2        Authority of Sellers. ................................................................ 20
    5.3        Title to Purchased Assets. ........................................................ 20
    5.4        Legal Proceedings. .................................................................. 20
    5.5        No Broker Fee. ........................................................................ 21

**SECTION 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............... 21

    6.1        Organization and Authority of Purchaser. ................................ 21
    6.2        Payment of the Purchase Price. ................................................ 22
    6.3        Ownership of Sellers. .............................................................. 22

**SECTION 7 COVENANTS OF THE PARTIES** ...................................................... 23

Case 17-04041    Doc 268    Filed 06/05/18    Entered 06/05/18 17:01:41    Desc Main
Document    Page 16 of 70

| | | |
|---|---|---|
| 7.1 | Bankruptcy Actions; Submission for Bankruptcy Court Approval; Irrevocability. | 23 |
| 7.2 | Further Assurances. | 23 |
| 7.3 | Expenses. | 24 |
| 7.4 | Collection of Receivables. | 24 |
| 7.5 | Employee Matters. | 24 |
| 7.6 | Notification of Breach; Disclosure. | 25 |

**SECTION 8 CONDITIONS TO CLOSING** .......................................................**25**

| | | |
|---|---|---|
| 8.1 | Conditions to Obligations of Each Party. | 25 |
| 8.2 | Conditions to Obligations of Purchaser | 26 |
| 8.3 | Conditions to Obligations of Sellers. | 26 |

**SECTION 9 TERMINATION** .........................................................................**27**

| | | |
|---|---|---|
| 9.1 | Termination. | 27 |
| 9.2 | Effect of Termination. | 28 |

**SECTION 10 MISCELLANEOUS PROVISIONS** ............................................**28**

| | | |
|---|---|---|
| 10.1 | Amendment and Modification. | 28 |
| 10.2 | Survival. | 28 |
| 10.3 | Notices. | 28 |
| 10.4 | Successors and Assigns. | 29 |
| 10.5 | Severability. | 30 |
| 10.6 | Governing Law. | 30 |
| 10.7 | Waivers. | 30 |
| 10.8 | Execution in Counterparts. | 31 |
| 10.9 | Incorporation of Schedules and Exhibits. | 31 |
| 10.10 | Entire Agreement. | 31 |
| 10.11 | Remedies. | 31 |
| 10.12 | Mutual Drafting: Headings. | 31 |
| 10.13 | No Third Party Beneficiaries. | 32 |
| 10.14 | Bulk Sales Law. | 32 |

99999.40176 560609v4

# SCHEDULES

| Section | Schedule |
|---------|----------|
| 2.1(a)(v) | Assumed Contracts |
| 2.1(a)(vi) | Assumed Leases |
| 2.1(a)(vii) | Permits |
| 2.3(a) | Sellers' Obligations to PNC Bank, N.A. |
| 2.3(b) | Sellers' Obligations to Regions Bank and Regions Equipment Finance |
| 2.3(c) | Sellers' Obligations to United States Small Business Administration |
| 2.3(d) | Cure Costs |
| 7.5(a) | List of Employees |

99999.40176 560609v4

# EXHIBIT LIST

Exhibit A - Form of Purchaser Note
Exhibit B - Form of Guaranty Agreement

99999.40176 560609v4

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of April 19, 2018, by and among HORIZON SHIPBUILDING, INC., an Alabama corporation ("Horizon"), SHIP AND SHORE CONSTRUCTION, LLC, an Alabama limited liability company ("Ship and Shore" and, collectively with Horizon, "Sellers"), and SHARK TECH LLC and/or its assignees and designees, an Alabama limited liability company ("Purchaser"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1.1.

**WHEREAS**, Sellers are engaged in the business of building, constructing, manufacturing, and maintenance of water faring ships and other floating vessels and watercraft (the "Business");

**WHEREAS**, Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers, the Purchased Assets upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated by this Agreement pursuant to section 363 of the Bankruptcy Code; and

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## SECTION 1
## DEFINITIONS

**1.1**     **Definitions.**

In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.

(a)     "Accounts Receivable" means, with respect to a Sellers, all accounts receivable and other rights to payment of Sellers and the full benefit of all security for such accounts receivable or rights to payment, including all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Sellers, any other miscellaneous accounts receivable of Sellers, and any claim, remedy or other right of Sellers related to any of the foregoing.

(b)     "Action" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

(c)     "Advancement of Cure Costs" means the sum of $221,116.70 advanced by Purchaser to cure Sellers' accrued and unpaid obligations to PNC Bank, N.A., Regions Bank, Regions Equipment Finance, and additional advances, if any, made by the Purchaser on account

of such future obligations, or to cure Sellers' obligations to additional parties, to the extent that Purchaser agrees to pay such amounts.

(d)     "Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

(e)     "Agreement" has the meaning specified in the preamble.

(f)     "Alternate Transaction" means any one of the following transactions with or by any Person or group of Persons (other than Purchaser): (a) a merger, consolidation or similar transaction involving Sellers (other than with a direct or indirect, wholly-owned subsidiary of Sellers), or (b) a sale, lease or other disposition, directly or indirectly, by merger, consolidation, tender offer, share exchange or otherwise, of any material assets of Sellers, excluding the Excluded Assets and Excluded Liabilities, outside of the Ordinary Course of Business.

(g)     "Ancillary Documents" means the Bill of Sale, Assumption and Assignment Agreement, Assignment of Copyrights, Assignment of Domain Names, Assignment of Patents, Assignment of Trademarks, Assumption and Assignment of Leases, and each other agreement, document or instrument (other than this Agreement) executed and delivered by the Parties in connection with the consummation of the transactions contemplated by this Agreement.

(h)     "Assignment of Copyrights" has the meaning specified in Section 4.3(b).

(i)     "Assignment of Domain Names" has the meaning specified in Section 4.3(b).

(j)     "Assignment of Patents" has the meaning specified in Section 4.3(b).

(k)     "Assignment of Trademarks" has the meaning specified in Section 4.3(b).

(l)     "Assumed Contracts" has the meaning specified in Section 2.1(a)(v).

(m)     "Assumed Leases" has the meaning specified in Section 2.1(a)(vi).

(n)     "Assumed Liabilities" has the meaning specified in Section 2.3.

(o)     "Assumption and Assignment Agreement" has the meaning specified in Section 2.3.

(p)     "Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code.

(q)     "Bankruptcy Case" means the case commenced by Horizon on October 24, 2017 in the Bankruptcy Court and assigned Case No. 17-04041 (JCO).

(r)     "Bankruptcy Code" means title 11 of the United States Code, sections 101 *et. seq*.

(s)     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Alabama.

(t)     "Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance satisfactory to Purchaser, approving bidding procedures and the amount, timing and terms of payment of the Break-Up Fee and Expense Reimbursement as set forth herein and therein.

(u)     "Bill of Sale" has the meaning specified in Section 4.3(a).

(v)     "Break-Up Fee" means the fee of $250,000 plus the aggregate amount actually paid by Purchaser as Advancement of Cure Costs, payable to Purchaser by a Person or group of Persons (other than Purchaser or Sellers) at the closing of any Alternate Transaction.

(w)     "Business" has the meaning specified in the recitals.

(x)     "Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

(y)     "Cash Payments" has the meaning specified in Section 3.1(a)(1).

(z)     "Closing" has the meaning specified in Section 4.1.

(aa)    "Closing Date" has the meaning specified in Section 4.1.

(bb)    "Code" means the United States Internal Revenue Code of 1986, as amended.

(cc)    "Computers" means all computer equipment and hardware, including all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto.

(dd)    "Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral), and any amendment thereto, that is legally binding, other than a Lease, to which Sellers is party.

(ee)    "Copyrights" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of

99999.40176 560609v45

copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

(ff) "Cure Costs" has the meaning specified in Section 2.3(d).

(gg) "Documents" means all books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media), in each case to the extent relating to the Purchased Assets or the Assumed Liabilities.

(hh) "Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.

(ii) "Encumbrance" means any interest, charge, lien, claim (as defined in section 101(5) of the Bankruptcy Code), mortgage, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

(jj) "Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which Sellers has an interest.

(kk) "Excluded Assets" has the meaning specified in Section 2.2.

(ll) "Excluded Contracts" has the meaning specified in Section 2.2(d).

(mm) "Excluded Leases" has the meaning specified in Section 2.2(e).

(nn) "Excluded Liabilities" has the meaning specified in Section 2.4.

(oo) "Filing" means the filing of a petition with the Bankruptcy Court under chapter 11 of the Bankruptcy Code in order to commence the Bankruptcy Case.

(pp) "Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

-4-

(qq)    "GAAP" means generally accepted accounting principles in the United States.

(rr)    "Governmental Authority" means any federal, state, local or foreign governmental entity or any subdivision, agency, instrumentality, authority, department, commission, board, bureau, official or other regulatory, administrative or judicial authority thereof or any federal, state, local or foreign court, tribunal or arbitrator or any self-regulatory organization, agency or commission.

(ss)    "Guaranty Agreement" means that certain Guaranty Agreement executed by Gravois Aluminum Boats LLC attached as Exhibit B to this Agreement.

(tt)    "Indebtedness" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (ii) all obligations of such Person for the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business (other than the current liability portion of any indebtedness for borrowed money)); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); and (vi) all obligations of the type referred to in clauses (i) through (v) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise.

(uu)    "Intellectual Property" means all intellectual property rights of any kind owned, used, held for use, or licensed (as licensor or licensee) by Sellers, including all Software, Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, all rights to privacy and personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other remedy in connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing.

(vv)    "Inventory" shall mean inventory of Sellers (including finished goods, work in process and raw materials).

(ww)    "Leases" means leases with respect to the Leased Real Property.

(xx)    "Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

(yy)    "Liability" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise),

99999.40176 560609v45

and including all costs and expenses relating thereto (including fees and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

(zz)  "Material Adverse Effect" means (a) any fact, condition, change, violation, inaccuracy, circumstance, effect or event, individually or in the aggregate, that has, or would be reasonably expected to have, a material adverse effect on the property, business, operations, assets (tangible and intangible), or condition (financial or otherwise) of the Business or the Purchased Assets or the ability of Seller to perform any of its material obligations under this Agreement or the Ancillary Documents to which any of them is a party, other than: (i) the effect of any change resulting from any action taken by Purchaser or its Affiliates with respect to the transactions contemplated hereby or with respect to Seller; (ii) any effect resulting from the filing or prosecution of the Bankruptcy Cases; (iii) the effect of any change that generally affects any industry in which Seller operates; (iv) the effect of any change arising in connection with earthquakes, hostilities, national calamities, acts of war, acts of God, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions existing or underway as of the date hereof; (v) the effect of any change in applicable law or GAAP or interpretation thereof; (vi) any public announcement of this Agreement; (vii) any actions or inactions by Seller in accordance with this Agreement or the consummation of the transactions contemplated by this Agreement; (viii) the failure by Seller to meet any projections (provided that the underlying causes of the failure shall not be excluded); or (ix) general economic, political or financial market conditions.

(aaa)  "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

(bbb)  "Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of Sellers in the ordinary and usual course) through the date hereof, consistent with past practice and, after the Filing, operations in a bankruptcy.

(ccc)  "Other Consents" has the meaning specified in Section 2.5(c).

(ddd)  "Party" or "Parties" means, individually or collectively, Purchaser and Sellers.

(eee)  "Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, technology, inventions (whether or not patentable or reduced to practice) or improvements thereto.

(fff)  "Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which are necessary for Sellers to own, lease and operate its properties and assets or to carry on the Business as it is now being conducted or as is presently intended to be conducted.

-6-

(ggg) "Permitted Encumbrances" means (i) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (ii) Encumbrances that constitute or are associated with Assumed Liabilities, (iii) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to real property, which do not, individually or in the aggregate, materially detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (iv) statutory liens for Taxes and assessments not yet due and payable, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers that, in each case, are not material to the Business or the value of the Purchased Assets, (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the Ordinary Course of Business that, in each case, are not material to the Business with respect to amounts not yet overdue, and (vi) such other imperfections in title which would not materially interfere with the use of the Purchased Assets; provided that, in each case enumerated in this definition, such Encumbrance shall only be a Permitted Encumbrance if it cannot be satisfied solely through the payment (by or on behalf of Sellers and not Purchaser) of money or otherwise removed, discharged, released or transferred, as the case may be, pursuant to Section 363(f) of the Bankruptcy Code or otherwise.

(hhh) "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

(iii) "Proceeding" means any legal action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

(jjj) "Purchase Price" has the meaning specified in Section 3.1.

(kkk) "Purchased Assets" means the assets specified in Section 2.1.

(lll) "Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity (including such deposits made by Sellers in connection with the Assumed Leases)) and prepaid charges and expenses of Sellers, other than any deposits or prepaid charges and expenses paid in connection with or relating exclusively to any Excluded Assets or any Excluded Liability.

(mmm)"Purchaser" has the meaning specified in the preamble.

(nnn) "Representative" means with respect to a particular Person, any duly authorized director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

(ooo) "Sale Hearing" means the hearing at which the Bankruptcy Court considers the Sale Motion.

99999.40176 560609v45

(ppp)  "Sale Motion" means the motion, in form and substance reasonably satisfactory to Purchaser, filed by Sellers pursuant to, inter alia, sections 363 and 365 of the Bankruptcy Code to secure entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court.

(qqq)  "Sale Order" means an Order of the Bankruptcy Court, in form and substance satisfactory to Purchaser, pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, inter alia, the sale of the Purchased Assets to Purchaser on the terms and conditions set forth herein free and clear of all Liabilities and Encumbrances (other than Permitted Encumbrances), the assumption and assignment of the Assumed Liabilities, and the assumption and assignment of the Assumed Contracts and Assumed Leases to Purchaser and (ii) containing certain findings of facts, including a finding that Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

(rrr)  "Schedule(s)" means any of the disclosure schedules attached hereto that Sellers has prepared and delivered to Purchaser pursuant to the terms of this Agreement, setting forth information regarding the Business, the Purchased Assets, the Assumed Liabilities and other matters with respect to Sellers as set forth therein.

(sss)  "Sellers" has the meaning specified in the preamble.

(ttt)  "Software" means all computer software programs (whether in source code, object code, or other form) and systems, databases and platforms owned, licensed or used by Sellers, including all databases, compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing.

(uuu)  "Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee liability in respect of any items described in clause (i) above.

(vvv)  "Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

(www)  "Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names (including all assumed or fictitious names under which the Business is conducted), and any other indicia of source of goods and

-8-

services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

(xxx) "Trade Secrets" means confidential or proprietary information and trade secrets (including ideas, research and development, know-how, formulae, compositions, processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals).

(yyy) "Transferred Employees" has the meaning specified in Section 7.5(a).

**1.2** **Other Definitional and Interpretive Matters.**

(a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i) Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii) Dollars. Any reference in this Agreement to $ means U.S. dollars.

(iii) Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v) Headings. The provision of a Table of Contents, the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi) Herein. The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b) No Strict Construction. The Parties participated jointly in the negotiation

99999.40176 560609v45

and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## SECTION 2
## PURCHASE AND SALE

    **2.1**    **Purchased Assets.**

        (a)    **Purchased Assets of Horizon**. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Horizon shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Horizon in, to or under all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, including all right, title and interest of Horizon in, to or under:

        (i)    all Accounts Receivable;

        (ii)    the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain Sellers's mail and other communications to the extent related to the other Purchased Assets and/or the Assumed Liabilities;

        (iii)    all Inventory;

        (iv)    all Equipment;

        (v)    all Contracts listed or described on Schedule 2.1(a)(v) (the "Assumed Contracts"); provided that Purchaser may amend or supplement Schedule 2.1(a)(v) at any time prior to the date that is five (5) days prior to the Sale Hearing;

        (vi)    all Leases of Leased Real Property listed or described on Schedule 2.1(f), including any improvements to such Leased Real Property (such Leases, the "Assumed Leases"); provided that Purchaser may amend or supplement Schedule 2.1(a)(vi) at any time prior to the date that is five (5) days prior to the Sale Hearing;

        (vii)    the Permits set forth on Schedule 2.1(a)(vii) and pending applications therefor, in each case to the extent assignable;

        (viii)    all Intellectual Property (including all goodwill associated therewith), including but not limited to the Domain Name horizonshipbulding.com;

        (ix)    all products and services currently marketed or sold by Sellers, including all products in development by Sellers;

99999.40176 560609v45
Case 17-04041    Doc 268    Filed 06/05/18    Entered 06/05/18 17:01:41    Desc Main
Document    Page 29 of 70

(x)　　all Documents except those (i) relating exclusively to any Excluded Asset or Excluded Liability; or (ii) relating to employees of Sellers who are not Transferred Employees;

(xi)　　all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business, to the extent assignable;

(xii)　　all Purchased Deposits;

(xiii)　　all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability;

(xiv)　　any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Sellers against third parties arising out of events occurring prior to the Closing Date, excluding the rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff that are identified as Excluded Assets in Section 2.2;

(xv)　　all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(xvi)　　any proprietary rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other product specification documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(xvii)　　all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business; and

(xviii)　　all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement; provided, however, none of the Parties hereto intends that Purchaser, or any of its Affiliates, shall be deemed to be a successor to Sellers with respect to Purchased Assets.

(b)　　**Purchased Assets of Ship and Shore**. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Ship and Shore shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Ship and Shore in, to, or under:

(i)　　the real property and improvements located at 9175-9225 Little River Road Bayou La Batre, Mobile County, Alabama (known as the "West Yard"); and

99999.40176 560609v45

(ii) the real property and improvements located at 13980 Shell Belt Road, Bayou La Batre, Mobile County, Alabama (known as the "Main Yard"); and

(iii) that certain Rough Terrain Crane (1990's model Cherry Picker).

## 2.2 Excluded Assets.

Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a) all cash and cash equivalents, including commercial paper, treasury bills, certificates of deposit and other bank deposits of Sellers;

(b) all shares of capital stock or other equity interests of Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of Sellers;

(c) all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(d) the proceeds of the Certificate of Deposit previously collateralizing Horizon's indemnification obligation to Hanover Insurance Company;

(e) all Contracts (and rights thereunder) not listed or described in Schedule 2.1(e) (the "Excluded Contracts");

(f) all Leases (and rights thereunder) not listed or described in Schedule 2.1(f) (the "Excluded Leases");

(g) all rights, claims or causes of action of Sellers under this Agreement or the Ancillary Documents;

(h) all Avoidance Actions;

(i) all receivables, rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff related exclusively to any Excluded Asset or any Excluded Liability;

(j) all insurance policies, including rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies (including all rights to proceeds under insurance policies) relating to claims for losses related exclusively to any Excluded Asset or Excluded Liability to the extent applicable;

(k) all Documents (A) relating exclusively to any Excluded Asset or any Excluded Liability, (B) relating to employees of Sellers who are not Transferred Employees, or (C) other books and records that Sellers are required by applicable law to retain or that Sellers

-12-

determines are necessary to retain including Tax Returns, financial statements, and corporate or other entity filings (provided, however, that Purchaser shall have, to the extent allowed by applicable law, the right to make copies of any portions of such retained books and records that relate to the Business, the Purchased Assets or the Assumed Liabilities);

(l)     all deposits or prepaid charges and prepaid expenses paid relating exclusively to any of the other Excluded Assets or any Excluded Liability;

(m)     all reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(n)     all monies owed by HNY Ferry Fleet, LLC or Horn blower to Seller whether the liability to Seller is liquidated or unliquidated, disputed or undisputed, contingent or non-contingent, fixed or not fixed, or the subject of a cause of action in a complaint or counterclaim whether filed or unfiled by Seller; and,

(o)     the unliquidated claim against the U.S. Army Corps of Engineers for equitable adjustment listed on Sellers Chapter 11 Schedules at B-75.

**2.3     Assumed Liabilities.**

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall execute and deliver to Sellers an assumption and assignment agreement in form and substance reasonably satisfactory to Sellers and Purchaser (the "Assumption and Assignment Agreement") pursuant to which Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof), and to obtain Sellers' and all guarantors release from, only the following Liabilities (without duplication) (collectively the "Assumed Liabilities") and no others:

(a)     subject to Section 6.2(a) and Section 8.2, the obligations of Sellers to PNC Bank, N.A. set forth on Schedule 2.3(a); provided however that in the event this transaction does not close becauset PNC Bank, N.A. or its successor does not consent in writing to Purchaser's assumption of Sellers' obligations at or prior to Closing and no financing is obtained by Purchaser to pay off the debt of PNC, Purchaser shall have no obligation to assume Sellers' obligations to PNC;

(b)     subject to Section 6.2(a) and Section 8.2, the obligations of Sellers to Regions Bank and Regions Equipment Finance set forth on Schedule 2.3(b); provided however that in the event this transaction does not close  because Regions Bank and Regions Equipment Finance, or their respective successor(s) do not consent in writing to Purchaser's assumption of Sellers' obligations at or prior to Closing and no financing is obtained by Purchaser to pay off the debt of Regions Bank and Regions Equipment Finance, Purchaser shall have no obligation to assume Sellers' obligations to Regions Bank and Regions Equipment Finance;

(c)     subject to Section 6.2(a) and Section 8.2, the secured obligations of Sellers to the United States Small Business Administration set forth on Schedule 2.3(c).

(d)     the obligations of Horizon under the Assumed Contracts and Assumed

99999.40176 560609v45

Leases to the extent required by section 365(b) of the Bankruptcy Code (in the amounts set forth on Schedule 2.3(d) or as otherwise determined by the Bankruptcy Court) (the "Cure Costs");

(e)     all Liabilities under the Assumed Contracts and the Assumed Leases arising at or after the Closing Date; and

(f)     all Liabilities arising out of the conduct of the Business or ownership of any Purchased Asset at or after the Closing Date.

## 2.4     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (collectively the "Excluded Liabilities"). For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following:

(a)     any Liability of Sellers, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Sellers;

(b)     other than as specifically set forth herein, any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)     any Liability for Taxes (i) attributable to periods or portions thereof ending on or prior to the Closing Date, (ii) of Sellers, or any member of any consolidated, affiliated, combined or unitary group of which Sellers are or have been a member, for Taxes and (iii) of any other Person pursuant to an agreement or otherwise;

(d)     any Liability incurred by Sellers or its directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing Date;

(e)     any Liability of Sellers to any Person on account of any Action or Proceeding;

(f)     any Liability relating to or arising out of the ownership or operation of an Excluded Asset;

(g)     other than as specifically set forth herein, any Liability or obligation of Sellers under any Indebtedness, including any Indebtedness owed to any stockholder, subsidiary or other Affiliate of Sellers, and any Contract evidencing any such Indebtedness;

-14-

(h) any Liability with respect to Sellers' employees (in their capacities as such), including, but not limited to, any Liability for severance or other termination payments or outstanding payroll taxes (which shall be paid by Sellers during the Bankruptcy Case or immediately after the Closing Date from the proceeds of the transactions contemplated by this Agreement);

(i) other than as specifically set forth herein, fees or expenses of Sellers incurred with respect to the transactions contemplated herein; and

(j) Cure Costs in excess of an aggregate amount set forth on Schedule 2.3(d) except to the extent determined otherwise by the Bankruptcy Court.

**2.5**     **Assignments.**

(a) Sellers shall transfer and assign all Assumed Contracts and Assumed Leases to Purchaser, and Purchaser shall assume all Assumed Contracts and Assumed Leases from Sellers, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.

(b) The Sale Order shall provide that, as of the Closing, Sellers shall assign to Purchaser the Assumed Contracts and Assumed Leases and the Assumed Contracts and Assumed Leases shall be identified by the name and date of the Assumed Contract or Assumed Lease, the other party to the Assumed Contract or Assumed Lease, as the case may be, and the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Assumed Contracts and Assumed Leases. Such exhibit shall also (i) set forth the amounts necessary to cure any defaults under each of the Assumed Contracts and Assumed Leases as determined by Sellers based on Sellers's books and records or as otherwise determined by the Bankruptcy Court, and (ii) delineate a procedure for transferring to Purchaser the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Assumed Lease.

(c) In the case of Permits, Leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, cooperate with Purchaser in endeavoring to obtain such consent (all such consents, whether obtained prior to or after the Closing being referred to herein as the "Other Consents").

**2.6**     **Further Assurances.**

(a) At the Closing, and at all times thereafter as may be necessary, to the extent Sellers have personnel and at Purchaser's expense, Sellers and Purchaser shall execute and deliver such other instruments of transfer as shall be reasonably necessary to vest in Purchaser title to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances), and such other instruments as shall be reasonably necessary to evidence the assignment by Sellers and the assumption by Purchaser or its designee of the Assumed

-15-

Liabilities, including the Assumed Contracts and Assumed Leases. Sellers and Purchaser shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby.

(b)     At the Closing, and at all times as may be necessary thereafter, (i) to the extent that Sellers have the personnel and documentation required to do so and (ii) at Purchaser's expense, Sellers shall, at the reasonable request of Purchaser, execute, deliver, and file, or cause to be executed, delivered, and filed, such other instruments of conveyance and transfer and take such other actions as Purchaser may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement and to vest in Purchaser good and marketable title to the Intellectual Property included in the Purchased Assets, including executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the transfer of title to Purchaser with respect to ownership of the Intellectual Property included in the Purchased Assets.

(c)     Sellers hereby grants to Purchaser a power of attorney, which power of attorney is irrevocable and coupled with an interest, to execute, deliver and/or file on behalf of Sellers any documents or instruments required to be executed, delivered or filed by or on behalf of Sellers after the Closing pursuant to this Section 2.6.

## SECTION 3
## PURCHASE PRICE

**3.1     Purchase Price.**

(a)     Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the purchase price to be paid by Purchaser to Sellers in exchange for the Purchased Assets (the "Purchase Price") shall be the sum of the following:

(i)     cash payments payable to Horizon or its designee in the aggregate amount of $525,000 (the "Cash Payments"), payable as follows: $175,000 at Closing; $175,000 no later than the first anniversary of the Closing; and $175,000 no later than the second anniversary of the Closing. The Cash Payments shall be guaranteed by Gravois Aluminum Boats LLC pursuant to the Guaranty Agreement attached as Exhibit B. In the event Purchaser shall fail to pay any installment when due, Seller shall be entitled to accelerate the entire unpaid balance and Purchaser shall be liable immediately for the entire unpaid balance. In the event of default, Purchaser shall pay all costs of collection, including a reasonable attorney's fee and court costs; plus

(ii)     the Purchaser Note in the aggregate principal amount of $500,000 payable to Horizon substantially in the form attached hereto as Exhibit A; plus

(iii)     (x) the assumption by Purchaser of the Assumed Liabilities or (y) if Purchaser is unable to obtain the consent of PNC Bank, N.A., Regions Bank, Regions Equipment Finance, or the United States Small Business Administration to the assumption of Sellers' respective secured obligations, then subject to Section 6.2(a) Purchaser shall satisfy

99999.40176 560609v45

Sellers' secured obligations to each such non-consenting secured creditor in Cash.

(b)     The Sale Order shall provide that, in the event this Agreement is rendered null, void, unenforceable, or otherwise ineffective, due to the Sellers' entry into an Alternate Transaction, and subject to Section 9.2 and Section 10, Purchaser shall be entitled to the Break-Up Fee at the closing of such Alternate Transaction.

**3.2     Closing Date Payments.**

(a)     Purchaser shall pay directly to the parties identified on Schedule 2.3(d) the Cure Costs;

(b)     with respect to the Assumed Liabilities, by Purchaser assuming or satisfying such Assumed Liabilities at the Closing; and

(c)     Purchaser shall pay to Horizon the amount set forth in Section 4.2(c).

**SECTION 4**
**CLOSING AND POST CLOSING ACCESS**

**4.1     Closing; Closing Date.**

Upon the terms and conditions set forth in this Agreement the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Cullen and Dykman LLP, One Riverfront Plaza, Newark, New Jersey 07102, or by electronic delivery of required Closing items, as promptly as practicable, and at no time later than the third Business Day, following the date on which the conditions set forth in Section 6.2(a) and Section 8 have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as Purchaser and Sellers may mutually agree.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

**4.2     Purchaser's Deliveries.**

At or prior to the Closing, Purchaser shall deliver to Sellers:

(a)     the Assumption and Assignment Agreement, and each other Ancillary Document to which Purchaser is contemplated to be a party, duly executed by Purchaser;

(b)     the Purchaser Note and Guaranty Agreement pursuant to Section 3.1(a)(i) and Section 3.1(a)(ii).

(c)     payment of $175,000 in certified funds payable to Horizon pursuant to Section 3.1(a)(i) of this Agreement; and

(d)     such other assignments and other good and sufficient instruments of

99999.40176 560609v45

assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Assumed Liabilities to Purchaser.

**4.3     Sellers' Deliveries.**

At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)     A bill of sale in form and substance reasonably satisfactory to Purchaser (the "Bill of Sale") and any required assumption and assignment agreement and each other Ancillary Document to which any Seller is contemplated to be a party, duly executed by such applicable Seller(s);

(b)     instruments of assignment of the Copyrights (the "Assignment of Copyrights"), Domain Names (the "Assignment of Domain Names"), Patents (the "Assignment of Patents"), and Trademarks (the "Assignment of Trademarks"),  that are owned by any of Sellers and included in the Purchased Assets, if any, duly executed by such applicable Seller(s), in form for recordation with the appropriate Governmental Authorities, in form reasonably acceptable to the Parties, and any other assignments or instruments with respect to any Intellectual Property included in the Purchased Assets for which an assignment or instrument is required to assign, transfer and convey such assets to Purchaser;

(c)     a copy of the final Sale Order;

(d)     the officer's certificates required to be delivered pursuant to Section 8.2(a)(ii);

(e)     certificates executed by Sellers, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that no Seller is a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)     instruments of assumption and assignment of the Assumed Leases in form reasonably acceptable to the Parties (the "Assumption and Assignment of Leases"), duly executed by the applicable Seller(s), in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments with respect to any Assumed Lease;

(g)     (i) all lease files for the Assumed Leases, including copies of any plans, specifications, warranties and other documents related thereto, and (ii) keys for the Leased Real Property and the access codes for any electronic security system located at the Leased Real Property which is the subject of an Assumed Lease;

(h)     a certificate of good standing, or equivalent document, for each Seller, as certified by the applicable Government Authority;

(i)     all instruments and documents necessary to release any and all Encumbrances (other than Permitted Encumbrances) and appropriate UCC financing statement amendments (termination statements); and

99999.40176 560609v45

(j)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all the right, title and interest of Sellers in, to or under any or all the Purchased Assets.

### 4.4     Closing Proceedings.

All proceedings to be taken and all documents to be executed and delivered by Sellers in connection with the consummation of the transaction contemplated to occur pursuant to this Agreement (the "Sale") shall be reasonably satisfactory in form and substance to Purchaser and its counsel. All proceedings to be taken and all documents to be executed and delivered by Purchaser in connection with the consummation of the Sale shall be reasonably satisfactory in form and substance to Sellers and their counsel. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously, and no proceedings shall be deemed taken nor any documents executed or delivered until all shall have been taken, executed and delivered

### 4.5     Risk of Loss and Possession.

Risk of loss with respect to the Purchased Assets shall remain with Sellers until the Closing. Possession of the Purchased Assets shall be delivered to Purchaser at the Closing.

### 4.6     Access.

Purchaser shall have access to the property upon which the Purchased Assets are located (the "Premises") for a period not to exceed sixty (60) days following the Closing Date, for the purpose of removing the Purchased Assets. To that end, Sellers shall be deemed to have granted to Purchaser, its successors and assignee(s), a non-exclusive easement for access, ingress and egress over and through the Premises for all purposes, including the use, operation, maintenance and removal of the Purchased Assets.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Sellers represent and warrant to Purchaser and agrees as follows:

### 5.1     Organization of Sellers.

Horizon is a corporation and Ship and Shore is a limited liability company, both duly organized, validly existing and in good standing under the laws of the State of Alabama. Sellers are in good standing in each jurisdiction in which the ownership or leasing of their properties or the conduct of their businesses requires such qualification, except where failure to so qualify or be in good standing would not reasonably be expected to have a Material Adverse Effect. Sellers have full power and authority to own or lease and to operate and use the Purchased Assets and to carry on the Business as now conducted.

-19-

**5.2**     **Authority of Sellers.**

(a)     Sellers have full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform their obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which Sellers are (or will be) a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by Sellers, and consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by all required action on the part of Sellers and, subject to the entry of the Sale Order, does not require any authorization or consent that has not been obtained. This Agreement has been duly authorized, executed and delivered by Sellers and, subject to the entry of the Sale Order, is the legal, valid and binding obligation of Sellers enforceable in accordance with its terms, and each of the Ancillary Documents to which Sellers is (or will be) a party has been duly authorized by Sellers and upon execution and delivery by Sellers and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of Sellers enforceable in accordance with its terms.

(b)     After giving effect to the Sale Order, none of the execution and delivery of this Agreement or any of the Ancillary Documents by Sellers, the consummation by Sellers of any of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof by Sellers, will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation or loss of a material benefit, or result in the creation of any Encumbrance on any of the Purchased Assets under (i) any charter (or similar governing instrument) or by-laws (or similar governing document) of Sellers, (ii) any Permits, (iii) any Order to which a Sellers is bound or any Purchased Asset is subject, (iv) any Legal Requirement affecting a Sellers or the Purchased Assets, or (v) any Contract to which a Sellers or any of the Purchased Assets is a party or otherwise bound, except in the case of clauses (ii) through and including (v) has not had and would not reasonably be expected to have a Material Adverse Effect.

**5.3**     **Title to Purchased Assets.**

Sellers have, and, upon delivery to Purchaser on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Sellers will thereby transfer to Purchaser, good and valid title to, or, in the case of property leased or licensed by Sellers, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Purchased Assets, free and clear of all Encumbrances, except for (i) the Assumed Liabilities and (ii) Permitted Encumbrances.

**5.4**     **Legal Proceedings.**

Except for the Bankruptcy Case and litigation pending against Horizon brought by McAllister Towing and Transportation Co. and HNY Ferry Fleet LLC, there is no judicial, administrative or arbitral action, suit or proceeding, public or private, pending in which Sellers are a party or threatened against Sellers.

99999.40176 560609v45

**5.5** **No Broker Fee.**

No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof based on any acts by or on behalf of Sellers.

**EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN <u>SECTION 5</u> HEREOF, THE ANCILLARY DOCUMENTS, AND ALL OTHER DOCUMENTS, INSTRUMENTS AND CERTIFICATES REQUIRED TO BE DELIVERED TO PURCHASER AT OR IN CONNECTION WITH THE CLOSING: (A) NEITHER SELLERS, NOR ANY OF THEIR REPRESENTATIVES, AGENTS, DIRECT OR INDIRECT SHAREHOLDERS, OR ANY OF THE AFFILIATES OF ANY OF THE FOREGOING, MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS, OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED, OR MADE AVAILABLE, TO PURCHASER OR ANY OF ITS REPRESENTATIVES, AGENTS, DIRECT OR INDIRECT SHAREHOLDERS, OR ANY OF THE AFFILIATES OF ANY OF THE FOREGOING, IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY; (B) ALL THE PURCHASED ASSETS SHALL BE TRANSFERRED ON AN "AS-IS, WHERE-IS" BASIS; AND (C) SELLERS MAKE NO FURTHER REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY OR REPRESENTATION AS TO THE VALUE, CONDITION, MERCHANTABILITY OR SUITABILITY AS TO ANY OF THE PURCHASED ASSETS), IN RESPECT OF THE CONDITION OR SUITABILITY OF THE PURCHASED ASSETS, AND ANY SUCH REPRESENTATION AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED THEREON AND HAS ONLY RELIED ON THE REPRESENTATIONS AND WARRANTIES IN <u>SECTION 5</u> HEREOF, THE ANCILLARY DOCUMENTS AND ALL OTHER DOCUMENTS, INSTRUMENTS AND CERTIFICATES REQUIRED TO BE DELIVERED TO PURCHASER AT OR IN CONNECTION WITH THE CLOSING.**

**SECTION 6**
**<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>**

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser hereby represents and warrants to Sellers and agrees as follows:

**6.1** **<u>Organization and Authority of Purchaser</u>.**

(a)        Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Alabama.  Purchaser has full power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is (or will be) a party.  The execution, delivery and performance of this Agreement and such Ancillary Documents by Purchaser have been duly authorized and

-21-

approved by Purchaser's officers and do not require any further authorization or consent of Purchaser or its directors, officers or shareholders. This Agreement has been duly authorized, executed and delivered by Purchaser and is the legal, valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms, and each Ancillary Document to which Purchaser is (or will be) a party has been duly authorized by Purchaser and upon execution and delivery by Purchaser will be a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)     None of the execution and delivery of this Agreement or any of the Ancillary Documents by Purchaser, the consummation by Purchaser of any of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof by Purchaser, will (A) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation or loss of a material benefit, or result in the creation of any Encumbrance on any of the assets or properties of Purchaser (in each case with or without notice or lapse of time or both), under (i) any charter (or similar governing instrument) or by-laws (or similar governing document) of Purchaser, (ii) any Order to which Purchaser or any of its assets is bound or subject, (iii) any Legal Requirement affecting Purchaser, or (iv) any Contract to which Purchaser is a party or otherwise bound, or (B) require the approval, consent, authorization or act of, or the making by Purchaser of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court.

**6.2     Payment of the Purchase Price.**

(a) Subject to Section 8, Purchaser's obligations under this Agreement are contingent on and Purchaser shall have no obligation to Close until the earlier of the date on which (i) Purchaser receives the written consent of PNC Bank, N.A., Regions Bank, Regions Equipment Finance, and the United States Small Business Administration to Purchaser's assumption of Seller's secured obligations to each such lender or (ii) the Purchaser shall have obtained financing or a written, unconditional commitment of financing, on terms acceptable Purchaser in its sole and absolute discretion in an amount sufficient to enable Purchaser to satisfy Sellers' secured obligations to PNC Bank, N.A., Regions Bank, Regions Equipment Finance, and the United States Small Business Administration.

(b)     Purchaser shall have at the Closing and on each date specified in Section 3.1(a)(i) hereof sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Cash Payments and the Purchaser Note pursuant to this Agreement and to pay any other amounts to be paid by it hereunder, including the Assumed Liabilities as set forth in Section 2.3(a)-(c) and Section 6.2(a).

**6.3     Ownership of Sellers.**

Purchaser does not hold, directly or indirectly, any beneficial or other ownership interest in any Sellers or any of their securities.

99999.40176 560609v45

## SECTION 7
## COVENANTS OF THE PARTIES

**7.1** **Bankruptcy Actions; Submission for Bankruptcy Court Approval; Irrevocability.**

(a) Horizon has filed a voluntary petition commencing the Bankruptcy Case and filed with the Bankruptcy Court the Sale Motion seeking approval of the transactions contemplated by this Agreement. Horizon shall use commercially reasonable efforts to (i) prosecute the Sale Motion, (ii) ensure that the Sale Order is entered no later than May 29, 2018, and (iii) ensure that the Sale Order becomes effective immediately upon entry and that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) be waived for cause.

(b) Horizon shall give notice under the Bankruptcy Code of the request for the relief specified in the Sale Motion to all Persons entitled to notice pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court, and orders of the Bankruptcy Court, including all Persons that have asserted Encumbrances in the Purchased Assets, and all non-debtor parties to the Assumed Contracts and Assumed Leases, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby.

(c) (i) Horizon and Purchaser shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order, (ii) all such filings shall be in form and substance acceptable to Purchaser, and (iii) Horizon shall use reasonable best efforts to provide Purchaser with a copy of such documents at least two (2) Business Days prior to the filing thereof.

(d) If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), subject to rights, otherwise arising from this Agreement, Sellers shall use commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

**7.2** **Further Assurances.**

Before and after the Closing, each party shall execute and deliver such instruments and take such other actions as the other may reasonably request for the purpose of carrying out the intent of this Agreement and the Ancillary Agreements. Each party shall use its best efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of government agencies and third parties and to make all filings with and give all notices to government agencies and third parties that may be necessary or reasonably required to effect

99999.40176 560609v45

such transactions.

**7.3    Expenses.**

Except to the extent otherwise provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs and expenses.

**7.4    Collection of Receivables.**

From and after the Closing, Sellers shall provide reasonable assistance to Purchaser in the collection of any Accounts Receivable, Notes Receivable, or Other Receivables included in the Purchased Assets. If, after the Closing Date, Sellers shall receive payment from any account debtor with respect to any Accounts Receivable included in the Purchased Assets, Sellers shall promptly thereafter deliver such funds and assets to Purchaser and take all steps necessary to vest title to such funds and/or assets in Purchaser. Effective as of the Closing Date, Sellers hereby designates Purchaser and its respective officers as Sellers' true and lawful attorney-in-fact, with full power of substitution, to execute and endorse for the benefit of Purchaser all checks, notes or other documents received by Sellers in payment of or in substitution or exchange for any of the Purchased Assets. Sellers hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Purchaser is coupled with an interest, and further agrees to execute and deliver to Purchaser from time to time any documents or other instruments reasonably requested by Purchaser to evidence such power of attorney.

**7.5    Employee Matters.**

(a)    _Transferred Employees._   Purchaser shall employ, effective as of the Closing Date and continuing for not less than sixty (60) days following the Closing Date, substantially all of Sellers' employees who remain employed by Sellers immediately prior to the Closing (including employees on approved leave of absence). The names of Sellers' employees as of the date hereof are listed on Schedule 7.5(a). Those of Sellers' employees (including any employees whose names are not set forth on Schedule 7.5(a)) who commence working for Purchaser on the Closing Date (or upon return to work from approved leave of absence) shall hereafter be referred to as "Transferred Employees". Such Transferred Employees shall receive the annual or hourly rate of pay, and with comparable opportunity to receive incentive or performance pay (other than equity based incentive compensation), at which such employees were employed immediately prior to the Closing. Such Transferred Employees shall receive benefits and be covered by employment policies on substantially similar terms and conditions as other employees of Purchaser or its Subsidiaries with similar titles and functions. Without limiting the generality of the foregoing, such employee benefits shall include immediate eligibility to participate in medical and health insurance plans and 401(k) or retirement plans under plans sponsored by Purchaser.

(b)    _Employment Tax Reporting._   With respect to Transferred Employees, Purchaser and Sellers shall use the standard procedure set forth in Revenue Procedure 2004-53m

-24-

2004-34 I.R.B. 320, for purposes of employment tax reporting.

(c)    No Obligation. Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Sellers or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including in respect of continued employment (or resumed employment) for any specified period. Nothing in this Section 7.5 is intended to interfere with Purchaser's right from and after the Closing to terminate the employment of, or change the compensation and benefits available to, any Transferred Employee.

**7.6    Notification of Breach; Disclosure.**

Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement). During the period prior to the Closing Date, each Party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. It is acknowledged and understood that no notice given pursuant to this Section 7.6 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

## SECTION 8
## CONDITIONS TO CLOSING

**8.1    Conditions to Obligations of Each Party.**

The respective obligations of each Party to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the following conditions:

(a)    all requisite authorizations or consents from Governmental Authorities, if any are required, or waiting periods following governmental filings shall have been obtained or expired, as the case may be;

(b)    the Sale Order shall have been entered and shall have become a Final Order; and

(c)    no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

-25-

**8.2     Conditions to Obligations of Purchaser.**

(a)     The obligation of Purchaser to purchase the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)     the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and all other documents, instruments and certificates required to be delivered to Purchaser at or in connection with the Closing shall be true and correct in all respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have or would not reasonably be expected to have, a Material Adverse Effect, and Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof;

(ii)     each covenant and obligation that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Purchaser shall have received a certificate of Sellers to such effect signed by a duly authorized manager or member thereof;

(iii)     each of the deliveries required to be made to Purchaser pursuant to Section 4.3 shall have been so delivered; and

(iv)     Purchaser shall have entered into employment agreements, on terms and conditions that are acceptable to Purchaser in its sole discretion with (x) Travis Short and (y) any other with key management personnel identified by Purchaser prior to the Closing Date; and

(v)     (i) Purchaser's receipt of written consents to the assumption of Sellers' secured obligations to PNC Bank, N.A., Regions Bank, Regions Equipment Finance, and the United States Small Business Administration or (ii) Purchaser shall have obtained financing on terms acceptable to Purchaser in its sole and absolute discretion in an amount sufficient to enable Purchaser to satisfy Sellers' secured obligations to PNC Bank, N.A., Regions Bank, Regions Equipment Finance, and the United States Small Business Administration.

(b)     Any condition specified in Section 8.2(a) may be waived by Purchaser; provided that no such waiver shall be effective against Purchaser unless it is set forth in a writing executed by Purchaser.

**8.3     Conditions to Obligations of Sellers.**

(a)     The obligation of Sellers to sell the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

-26-

(i)    the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except that any representations and warranties that are made as of a particular date or period shall be true and correct only as of such particular date or period), and Sellers shall have received a certificate of Purchaser to such effect signed by a duly authorized officer thereof;

(ii)    each covenant and obligation that Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Sellers shall have received a certificate of Purchaser to such effect signed by a duly authorized director or officer thereof; and

(iii)    each of the deliveries required to be made to Sellers pursuant to Section 4.2 shall have been so delivered; and

(b)    Any condition specified in Section 8.3(a) may be waived by Sellers; provided that no such waiver shall be effective against Sellers unless it is set forth in writing executed by Sellers.

## SECTION 9
## TERMINATION

**9.1    Termination.**

This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, by written notice to the other Parties hereto, at any time prior to the Closing Date, as follows:

(a)    by mutual written consent of Purchaser and Sellers;

(b)    by either Purchaser or Sellers if any permanent injunction or other Order of a court of competent authority or government agency which prevents the consummation of the transactions contemplated by this Agreement shall have become final and not appealable;

(c)    by either Purchaser or Sellers upon three (3) days written notice of such termination to the other Parties, if the Closing shall not have occurred on or prior to May 29, 2018; provided, however, that the failure of the Closing to occur by such date is not due (in whole or in part) to a material breach by the terminating Party of such Party's representations, warranties, covenants or obligations under this Agreement;

(d)    by Sellers if there has been a breach by Purchaser of any of its representations, warranties, covenants or obligations that would result in a condition set forth in Section 8.3(a)(i), (a)(ii), or (a)(iii) not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by Sellers to Purchaser, and has not been waived by Sellers;

(e)    by Purchaser if there has been a breach by Sellers of any of its

99999.40176 560609v45

representations, warranties, covenants or obligations that would result in the condition set forth in Section 8.2(a)(i), (a)(ii) or (a)(iii) not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by Purchaser to Sellers, and has not been waived by Purchaser;

**9.2** **Effect of Termination.**

In the event this Agreement is terminated by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party except as otherwise provided in this Section 9 and except that each Party shall be liable for any willful and intentional breach of this Agreement by such Party. Notwithstanding the foregoing, the provisions of Section 3.1(b) (but only in the event Sellers, or either one of them, enters into an Alternate Transaction), this Section 9.2, and Section 10, shall expressly survive the expiration or termination of this Agreement.

**SECTION 10**
**MISCELLANEOUS PROVISIONS**

**10.1** **Amendment and Modification.**

This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of Sellers and Purchaser making specific reference to this Agreement.

**10.2** **Survival.**

None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing. All covenants and agreements contained herein which by their terms contemplate actions or impose obligations following the Closing shall survive the Closing Date and remain in full force and effect in accordance with their respective terms

**10.3** **Notices.**

All notices or other communications required or permitted hereunder shall be in writing and shall be given or delivered by personal delivery, by facsimile or e-mail, or by a nationally recognized private overnight courier service addressed as follows:

If to Purchaser, to:

Metal Shark Boats
Attention: Nate Geiger, Chief Financial Officer
6814 E. Admiral Doyle Dr.
Jeanerette, Louisiana 70544
ngeiger@metalsharkboats.com

-28-

with a copy to (which alone shall not constitute notice):

> Cullen and Dykman LLP
> Attention: S. Jason Teele, Esq.
> One Riverfront Plaza
> 1037 Raymond Boulevard, Suite 510
> Newark, New Jersey 07102
> E-mail: steele@cullenanddykman.com

If to Sellers, to:

> Horizon Shipbuilding, Inc.
> 13980 Shell Belt Road
> Bayou La Batre, Alabama 36509
> Attention: Travis Short, President and Chief Executive Officer
> E-mail: trshort@horizonshipbuilding.com

> and

> Ship and Shore Construction, LLC
> 13980 Shellboat Road
> Bayou La Batre, Alabama 36509
> Attention: Travis Short, President and Chief Executive Officer
> E-mail: trshort@horizonshipbuilding.com

> with a copy to (which alone shall not constitute notice):
> Irvin Grodsky, P.C.
> Attention: Irvin Grodsky, Esq.
> P.O. Box 3123
> Mobile, Alabama 36652
> Facsimile: (251) 433-3670
> E-mail: igrodsky@irvingrodskypc.com

or to such other address, facsimile number or e-mail address as such Party may indicate by a notice delivered to the other Parties hereto.

Any notice, consent, authorization, direction or other communication delivered as aforesaid shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the date following the date upon which it is delivered for overnight delivery to such courier service, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via facsimile or e-mail, on the date of the transmission of the facsimile or e-mail.

**10.4  <u>Successors and Assigns</u>.**

Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such Parties without the written consent

-29-

of the other Parties hereto and any such assignment shall be null and void; provided, however, that the rights of Purchaser under this Agreement may be assigned by Purchaser, without the prior written consent of Sellers, to any Affiliate thereof under common control with Purchaser. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of Sellers, any trustee appointed in the Bankruptcy Case.

### 10.5 Severability.

If any non-material term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible; provided, however, that in doing so, no Party shall be obligated to waive or forego any material right or benefit available to it hereunder.

### 10.6 Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama applicable to contracts executed in and to be performed in that State, without regard to choice or conflict of law principles that would result in application of any laws other than the laws of the State of Alabama.

(b)     Until the Bankruptcy Case is closed by a Final Order of the bankruptcy Court all Actions and Proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties hereby consent to service of process by mail (in accordance with Section 10.3) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, PURCHASER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

### 10.7 Waivers.

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such

99999.40176 560609v45

waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized Representative of such Party. Except as otherwise provided herein, the failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

### 10.8 Execution in Counterparts.

This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

### 10.9 Incorporation of Schedules and Exhibits.

All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

### 10.10 Entire Agreement.

This Agreement (including all Schedules and all Exhibits) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect thereto.

### 10.11 Remedies.

The Parties agree that irreparable damage may occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement. It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

### 10.12 Mutual Drafting: Headings.

The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the

99999.40176 560609v45

Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

### 10.13 No Third Party Beneficiaries.

This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

### 10.14 Bulk Sales Law.

Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchaser. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**[Signatures on following page]**

99999.40176 560609v45

**IN WITNESS WHEREOF,** the parties hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

PURCHASER:

**SHARK TECH LLC**

By: *Chris Allard*

Name:  Chris Allard

Title:  Chief Executive Officer

SELLERS:

**HORIZON SHIPBUILDING, INC.**

By:

Name:  Travis Short

Title:  President and Chief Executive Officer

**SHIP AND SHORE CONSTRUCTION, LLC**

By:

Name:  Travis Short

Title:  Managing Member

99999.40176 560609v45

Schedule 2.1(a)(v)
(Assumed Contracts)

None.

<u>Schedule 2.1(a)(vi)</u>
(Assumed Leases)

None.

<u>Schedule 2.1(g)</u>
(Permits)

To be provided

<u>Schedule 2.3(a)</u>
(Sellers' Obligations to PNC Bank, N.A.)

Ship and Shore Construction, LLC's and Horizon Shipbuilding, Inc.'s debts arising from the following documents and instruments in the amount of $2,260,417.10 as of March 31, 2018 plus interest and expenses accruing thereof. This liability arises from:

1. Amended and Restated Open End Mortgage, Assignment of Rents and Leases, and Security Agreement made as of June 17, 2014 between Ship and Shore Construction, LLC and PNC Bank, N.A.

2. Master Agreement as of June 29, 2012 between Ship and Shore Construction, LLC and PNC Bank, N.A.

3. Guaranty and Suretyship Agreement of June 29, 2012 by Horizon Shipbuilding, Inc. to PNC Bank, N.A. guarantying debts of Ship and Shore Construction, LLC.

4. Guaranty and Suretyship Agreement of June 29, 2012 by Travis Short to PNC Bank guarantying debt of Ship and Shore Construction, LLC.

5. Amendment to Loan Documents dated June 17, 2014 by and between Ship and Shore Construction, LLC and PNC Bank, N.A.

6. Assignment of Rents, Leases, and Profits dated June 29, 2012 by Ship and Shore Construction, LLC in favor of PNC Bank, N.A.

7. PNC Bank, N.A. Term Note $3,100,000 of June 29, 2012 signed by PNC Bank, N.A.

<u>Schedule 2.3(b)</u>
(Sellers' Obligations to Regions Bank and Regions Equipment Finance Corporation)

Ship and Shore Construction, LLC's and Horizon Shipbuilding, Inc.'s debts arising from the following documents and instruments in the amount of $2,677,206.85 as of February 11, 2018 plus interest and expenses accruing thereof. This liability arises from:

1. Ship and Shore Construction, LLC Promissory Note dated January 11, 2013 in the original principal amount of $1,606,450.50.

2. A first position mortgage against certain real property owned by Ship and Shore Construction, LLC in Mobile County, Alabama.

3. Horizon Shipbuilding, Inc.'s guaranty to Regions Bank of the payment and performance of Ship and Shore Construction, LLC's obligation under the Promissory Note.

4. Master Agreement dated July 18, 2013 by and among Horizon Shipbuilding, Inc., Regions Equipment Finance Corporation, and Regions Commercial Equipment Finance, LLC, and Addendum thereto.

<u>Schedule 2.3(c)</u>
(Sellers' Obligations to United States Small Business Administration)

Ship and Shore Construction, LLC's and Horizon Shipbuilding, Inc.'s debts arising from the following documents and instruments in the amount of $878,509.32 as of January 12, 2018 plus interest and expenses accruing thereof. This liability arises from:

1.      Note and mortgage #2453346008

2.      Note and mortgage #2735664005

## Schedule 2.3(d)
### (Cure Costs)

None.

## Schedule 7.5(a)
## Horizon Employees

Travis Short
Mickey Cook
Lance Lemcool
Mike Collier
John Lander
Matthew Short
Kelsey Lander
Doug Davis
Patsy Nelson
Bridget Jordan
Jesse Dunn
Steve Mcknight
Heath Havard
Frankie Vickerie
Larry Rollison
Mike McLeod
Scott Jones
Eric Pettway
Jose Perez
Stanley McNeil
Anthony Short (no relation)
George Tillman
Derek Strong
Daniel Parker
Cecil Jenkins
Jonothan Lee
Bobby Dickens
Alana Morgan
Brian Watson

## Exhibit A
(Purchaser Note)

$500,000

_____ ___, 2018

**FOR VALUE RECEIVED**, Shark Tech LLC, a Louisiana limited liability company ("Maker"), promises to pay to Horizon Shipbuilding, Inc., an Alabama corporation ("Horizon"), (hereafter "Holder"), in lawful money of the United States of America, the aggregate principal sum of Five-Hundred Thousand dollars ($500,000), together with interest, in the manner provided below.

This Promissory Note has been executed and delivered pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, dated April 19, 2018, by and between Maker and Holder (the "Asset Purchase Agreement") and is subject to the terms and conditions of the Asset Purchase Agreement, which is by this reference, incorporated herein and made a part hereof attached hereto as Exhibit 1. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

1.  **Interest**
    The amount due under this Promissory Note shall bear interest at a rate per annum equal to five percent (5%).

2.  **Term; Payments**
    The term of this Promissory Note shall be seven (7) years from the date first written above. Maker shall pay Holder twenty-seven (27) equal quarterly payments of principal and interest of $21,208.85 and one (1) quarterly payment of principal and accrued interest of $21,208.97.

3.  **Manner of Payment**
    The first payment under this Promissory Note shall be due and payable on the last day of the calendar quarter in which the sale described in the Asset and Purchase Agreement closes. Thereafter all payments under this Promissory Note shall be made on or before the last day of each subsequent calendar quarter in which a payment is due. Payments shall be made by certified or bank cashier's check at such place in the United States of America as Holder shall designate to Maker in writing or by wire transfer of immediately available funds to an account designated by Holder in writing. If any payment pursuant to paragraph 2 of this Promissory Note is due on a day that is not a Business Day, such payment shall be due on the next succeeding Business Day. Failure to pay a quarterly payment by its due date shall constitute a default.

4.  **Acceleration**
    In the event the Maker fails to pay any quarterly payment on its due date the entire unpaid balance of this Purchaser Note shall become due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

5.  **Additional Costs**
    In case of default of any payment due pursuant to paragraph 2 of this Promissory Note, Maker will pay to Holder such further amount as will be sufficient to cover the cost and expenses of collection, including, without limitation, reasonable attorneys' fees, expenses, and disbursements. These costs will be added to the outstanding principal and will become immediately due.

6.  **Indemnification**
    Maker shall, and hereby agrees to, indemnify Holder against all fees, costs and expenses which in any way relate to, or were precipitated by, Maker's breach of this agreement.

7.  **Amendment; Modification; Waiver**
    No amendment, modification or waiver of any provision of this Promissory Note or consent to departure therefrom shall be effective unless by written agreement signed by both Maker and Holder.

8.  **Successors**
    The terms and conditions of this Promissory Note shall inure to the benefit of and be binding jointly and severally upon the successors, assigns, heirs, survivors and personal representatives of Maker and shall inure to the benefit of Holder, its legal representatives, successors and assigns.

9.  **Breach of Promissory Note**
    No breach of any provision of this Promissory Note shall be deemed waived unless it is waived in writing. No course of dealing and no delay on the part of Holder in exercising any right will operate as a waiver thereof or otherwise prejudice Holder's rights, powers, or remedies. No right, power, or remedy conferred by this Promissory Note upon Holder will be exclusive of any other rights, power, or remedy referred to in this Promissory Note, or now or hereafter available at law, in equity, by statute, or otherwise.

10. **Governing Law**
    The validity, construction and performance of this Promissory Note will be governed by the laws of the State of Alabama. Maker hereby waives presentment, notice of non-payment, notice of dishonor, protest, demand and diligence.

**IN WITNESS WHEREOF**, Maker has executed and delivered this Note as of the date first stated above.

**MAKER:**

**SHARK TECH LLC**, a Louisiana corporation

By:_____
Name:  Chris Allard
Title:  Chief Executive Officer

## Exhibit B
### (Guaranty Agreement)

This GUARANTY AGREEMENT (this "<u>Guaranty</u>") is made as of the __ day of _____ 2018, by Gravois Aluminum Boats LLC, d/b/a Metal Shark Boats (the "<u>Guarantor</u>"), for the benefit of Horizon Shipbuilding, Inc. (the "<u>Beneficiary</u>"). Guarantor and Beneficiary are individually referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

**WHEREAS**, Shark Tech LLC (the "<u>Purchaser</u>"), a wholly-owned subsidiary of Guarantor, and Beneficiary are parties to an Asset Purchase Agreement, dated April 19, 2018 (the "<u>Asset Purchase Agreement</u>"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement;

**WHEREAS**, Purchaser agreed to make Cash Payments as partial consideration for the transactions described in the Asset Purchase Agreement pursuant to Section 3.1(a)(i) of the APA;

**WHEREAS**, Guarantor as the ultimate parent company of Purchaser, is willing to enter into this Guaranty to guarantee Purchaser's obligations to pay the Cash Payments;

**NOW, THEREFORE,** in consideration of the premises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. Guarantor hereby guarantees to and for the benefit of Beneficiary full and timely performance of the Purchaser's obligation to make the Cash Payments according to the terms of the APA Section 3.1(a)(i). Guarantor shall not be required to pay Purchaser's obligations under the Purchaser Note unless and until it receives Beneficiary's written demand for performance hereunder following Purchaser's breach of the Purchaser Note. Guarantor shall have ten (10) Business Days after notice of Purchaser's breach to make any Cash Payment installment due under Section 3.1(a)(i) of the APA that Purchaser failed to pay.

2. Any modification or amendment of the terms of the APA shall not affect the liability of Guarantor hereunder.

3. Notwithstanding anything to the contrary herein, Guarantor's liability under this Guaranty shall not exceed Purchaser's liability under the APA to make the unpaid balance of Cash Payments plus collection costs, including attorneys' fees.

4. This Guaranty shall continue in full force and effect until all of Purchaser's obligations under the Cash Payment obligation shall have been satisfied or discharged.

5. This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Alabama without regard to choice or conflict of law principles that would result in application of any laws other than the laws of the State of Alabama.

6. This Guaranty may be assigned by Beneficiary without Guarantor's prior written consent.

7. This Guaranty constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect thereto. This Guaranty may not be modified, amended or waived, except in writing signed by the Parties.

8. All notices, requests, demands, and other communications under this Guaranty shall be deemed to have been duly given to Guarantor and Beneficiary if delivered in accordance with the requirements set forth in Section 10.3 of the Asset Purchase Agreement to the addresses set forth therein.

This Guaranty Agreement has been duly executed by authorized representatives of each of the Parties as follows:

**GUARANTOR:**

**GRAVOIS ALUMINUM BOATS LLC, D/B/A METAL SHARK BOATS**

By: _____
Title: _____


**BENEFICIARY:**

**HORIZON SHIPBUILDING, INC.**

By: _____
Title: _____

EXHIBIT B
To Motion
(Assumed Leases)

None.

# AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment to Asset Purchase Agreement (this "Amendment") is made as of May 21, 2018, by and among Horizon Shipbuilding, Inc., an Alabama corporation ("Horizon"), Ship and Shore Construction, LLC, an Alabama limited liability company ("Ship and Shore" and, collectively with Horizon, "Sellers"), and Shark Tech LLC and/or its assignees and designees, an Alabama limited liability company ("Purchaser"). Sellers and Purchaser are referred to herein as a "Party" or, collectively, as the "Parties". Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Asset Purchase Agreement (defined below).

**WHEREAS**, Sellers and Purchaser are parties to that certain Asset Purchase Agreement dated as of April 19, 2018 (the "Asset Purchase Agreement"); and

**WHEREAS**, Section 2.2 of the Asset Purchase Agreement describes certain Excluded Assets that the Parties agree are not to be sold to Purchaser pursuant to the terms of the Asset Purchase Agreement. The parties agreed that certain partially built keels for the catamaran ferries subject to watercraft liens (the "Keels") were to be Excluded Assets, however, Section 2.2 erroneously does not provide for the exclusion of said assets from the sale; and,

**WHEREAS**, on April 19, 2018, Horizon filed in the Bankruptcy Case a Motion for Entry of an Order Authorizing the Sale (the "Sale Motion"), requesting among other things, Bankruptcy Court approval of the Asset Purchase Agreement and the transactions contemplated therein; and

**WHEREAS**, the Parties have agreed to execute this Amendment revising Section 2.2 of the Asset Purchase Agreement to properly reflect their agreement that the Keels are Excluded Assets;

**NOW**, **THEREFORE**, for and in consideration of the mutual promises contained in the Asset Purchase Agreement, the parties agree to this Amendment on the terms set forth below.

1.      The recitals set forth above are incorporated into this Amendment and made a part of the Parties agreement.

2.      Section 2.2 of the Asset Purchase Agreement is deleted in its entirety and replaced with the following:

    ## 2.2      Excluded Assets.

    (i)      Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a)     all cash and cash equivalents, including commercial paper, treasury bills, certificates of deposit and other bank deposits of Sellers;

(b)     all shares of capital stock or other equity interests of Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of Sellers;

(c)     the completed and partially completed keels for the Catamaran ferries to be built for HNY Ferry Fleet, LLC by Horizon;

(d)     all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(e)     the proceeds of the Certificate of Deposit previously collateralizing Horizon's indemnification obligation to Hanover Insurance Company;

(f)     all Contracts (and rights thereunder) not listed or described in Schedule 2.1(e) (the "Excluded Contracts");

(g)     all Leases (and rights thereunder) not listed or described in Schedule 2.1(f) (the "Excluded Leases");

(h)     all rights, claims or causes of action of Sellers under this Agreement or the Ancillary Documents;

(i)     all Avoidance Actions;

(j)     all receivables, rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff related exclusively to any Excluded Asset or any Excluded Liability;

(k)     all insurance policies, including rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies (including all rights to proceeds under insurance policies) relating to claims for losses related exclusively to any Excluded Asset or Excluded Liability to the extent applicable;

(l)     all Documents (A) relating exclusively to any Excluded Asset or any Excluded Liability, (B) relating to employees of Sellers who are not Transferred Employees, or (C) other books and records that Sellers are required by applicable law to retain or that Sellers determines are necessary to retain including Tax Returns, financial statements, and corporate or other entity filings (provided, however, that Purchaser shall have, to the extent allowed by applicable law, the right to make copies of

2

any portions of such retained books and records that relate to the Business, the Purchased Assets or the Assumed Liabilities);

Name:  Travis Short
Title:  Managing Member

(m)    all deposits or prepaid charges and prepaid expenses paid relating exclusively to any of the other Excluded Assets or any Excluded Liability;

(n)    all reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(o)    all monies owed by HNY Ferry Fleet, LLC or Horn blower to Seller whether the liability to Seller is liquidated or unliquidated, disputed or undisputed, contingent or non-contingent, fixed or not fixed, or the subject of a cause of action in a complaint or counterclaim whether filed or unfiled by Seller; and,

(p)    the unliquidated claim against the U.S. Army Corps of Engineers for equitable adjustment listed on Sellers Chapter 11 Schedules at B-75.

3.    Except as set forth herein, the Asset Purchase Agreement remains in full force and effect.

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**PURCHASER:**
**SHARK TECH LLC**

By: /s/ Chris Allard
Name:  Chris Allard
Title:    Chief Executive Officer

**SELLERS:**
**HORIZON SHIPBUILDING, INC.**

By: /s/ Travis Short
Name:  Travis Short
Title:    President and Chief Executive Officer

**SHIP AND SHORE CONSTRUCTION, LLC**

By: /s/ Travis Short
  Name:  Travis Short
  Title:    Managing Member

3